# STATE OF NORTH DAKOTA, Respondent, v. ANNA COOK, Appellant.

### (208 N. W. 556.)

**Criminal law — court will decide criminal case on appeal without regard to technical errors.**

1. It is the duty of this court, pursuant to § 11,013, Comp. Laws 1913, to decide a criminal case on appeal without regard to technical errors which do not affect the substantial rights of the parties.

**Intoxicating liquors — evidence supports finding that liquid sold was alcohol.**

2. For reasons stated in the opinion, it is held, that there is sufficient evidence to support the finding of the jury to the effect that the liquid sold by the defendant to the prohibition agents, was alcohol, within the prohibition of the statute and as charged in the information.

**Criminal law — supreme court does not lose jurisdiction of cause till remittitur has gone down.**

3. This court does not lose jurisdiction of a cause so as to be without power to grant a rehearing therein, until after the remittitur has gone down.

**Criminal law — court has power and duty as long as it retains jurisdiction of cause to correct errors in its decision because of mistaken assumption of fact of misinterpretation of evidence, both in civil and criminal cases.**

4. In the absence of a statutory prohibition, the power to grant a rehearing, upon the petition of the state or of the defendant in a criminal cause, inheres in this court. While ordinarily a rehearing is not granted upon questions not presented or discussed in the briefs or in the oral argument, a rehearing may be granted to consider new aspects of material evidence, which may affect the merits of the main controversy and which, through inadvertence, were not suggested by the parties or considered by the court when the original opinion was rendered. The court has the power and, it is its duty, so long as it retains jurisdiction of the cause, to correct errors in its decisions, which may have crept in, because of a mistaken assumption of fact, or a misinterpretation of the evidence. The rule, in this respect, is not different in criminal cases.

Note.— (2) Term "alcohol" defined, see 15 R. C. L. 248; 4 R. C. L. Supp. 984; 5 R. C. L. Supp. 831.

(3) Termination of Supreme Court in criminal case, see 2 R. C. L. 266; 1 R. C. L. Supp. 486; 5 R. C. L. Supp. 91.

**Criminal law — judgment of supreme court is not given until fifteen days from signing of decision and order during which period corrections may be made.**

   5. Under rule 15, of this court, the "judgment of the . . . court" within the provisions of § 11,019, Comp. Laws 1913, is not "given" until after the lapse of fifteen days from the date of the signing of the decision and of the order, and during such period counsel may call attention to errors in the opinion, or the court, on its own motion, may withdraw it for correction or change.

Opinion filed March 12, 1926.

   Appeal and Error, 4 C. J. § 2477 p. 621 n. 2; § 2478 p. 622 n. 9. Criminal Law, 17 C. J. § 3530 p. 199 n. 88; § 3531 p. 199 n. 96 New; § 3533 p. 199 n. 2; § 3534 p. 200 n. 21; § 3537 p. 200 n. 33; § 3751 p. 368 n. 5; § 3770 p. 375 n. 59, 66. Intoxicating Liquors, 33 C. J. § 465 p. 737 n. 89; § 526 p. 773 n. 92.

   Appeal from the District Court of Cass County, *Cooley, J.*
   Affirmed.
   *Wood & Breaw,* for appellant.
   *H. F. Horner,* State's Attorney, and *V. R. Lovell,* Assistant State's Attorney, for respondent.

   PER CURIAM (on rehearing). Defendant was convicted of the crime of bootlegging. In the information she was charged with selling "one pint of alcohol." She made a motion in arrest of judgment and, in the alternative, for a new trial. The motion was denied and defendant appeals from the order denying the motion and from the judgment.

   The testimony of the state's witnesses tends to show that on June 12, 1923, two prohibition agents met the defendant apparently by appointment, in a room in a hotel in the city of Fargo, and purchased from her a pint bottle containing a certain liquid. The bottle was delivered by the agents to one Cruden, a prohibition official, who kept it until the preliminary hearing before the magistrate. The bottle was alleged to have been sold to one Carter in the presence of Wright, another prohibition agent. Both officials testify, in substance, that the defendant came to their room in the hotel about 7:30 in the evening, delivered the bottle to Carter, and received $5 in payment. The state called one Hallenberg, druggist, as an expert witness. He testified that he had analyzed the contents of the bottle and found 94 per cent al-

cohol, 3 per cent water and 3 per cent acetone. The expert testified, in general, that the liquid was unfit for beverage purposes because of the presence of acetone. He says that the liquid is "not alcohol," or "not straight alcohol," but "is a mixture—alcohol," or a "compound mixture." Interrogated by the court, the witness testified: "It is an alcohol mixture, I can hardly describe it any other way."

While the defendant assigns several errors, the principal contention is that the state failed to prove that the compound or mixture was fit for beverage purposes. It is urged by the defendant that the mixture is not "alcohol," within the meaning of that term as used in § 1, chapter 268, Sess. Laws 1923; that it is a compound within the second class enumerated in that section and following the clause "in addition thereto;" that, therefore, it was the duty of the state to prove, not only an alcoholic content of $\frac{1}{2}$ of 1 per cent or more, but also that the mixture was fit for beverage purposes, within the rule laid down by this court in State v. Schuck, 51 N. D. 875, 201 N. W. 342. The contention of the state, on the other hand, is, and the conclusion of the trial court was, that the liquid is alcohol, within the statute; being alcohol, that its fitness as a beverage and its intoxicating quality are presumed. The court did not instruct the jury upon this precise question, merely saying, in substance that if they found, beyond a reasonable doubt, that the defendant sold alcohol to the officers, as alleged in the information she was guilty of bootlegging.

We have examined the errors assigned and find them without merit. They need not be noticed further. The only question is whether there is evidence sufficient to support the verdict in view of the specific offense charged, and in the light of the testimony of the State's expert that the liquid sold was an alcohol mixture, or compound.

. We have summarized the testimony of the expert who testified for the state as to the chemical analysis of the liquid sold by the defendant. It was upon this testimony that the state relied, when the case was first presented in this court. In the argument upon rehearing, counsel for the state concedes that the state did not refer to or rely on the testimony hereinafter mentioned when the case was first presented in this court. The testimony upon which reliance is now principally placed to sustain the conviction is very brief and somewhat general. Prohibition agent Wright testified that he opened the bottle after Carter purchased

it and smelled the contents; agent Carter, who made the purchase, testified that he tasted the contents of the bottle, in order to determine whether the liquid was water. Carter stated that the defendant came into the room in the hotel, where he and Wright were staying, and that "she had two pints of alcohol." Carter further testified that Wright, in his presence, asked the defendant "if that was good alcohol," and that "she said it was, that she had sold the doctors, etc."

It appears from the record that Wright and Carter had for some time been engaged in the service of the Federal government as law-enforcement agents; that all the circumstances indicate clearly that the defendant intended to sell and knew that the purchasers believed they were purchasing alcohol for beverage purposes. From all the testimony, the jury could have entertained no doubt that the defendant knowingly and intentionally engaged in an illicit transaction and that the prohibition agents who made the purchase supposed and were encouraged to believe that the liquid brought to the hotel room by the defendant was alcohol. It is true that the testimony of the chemist tends to show that the liquid, when subjected to a careful chemical analysis, does not fully conform with formula standards prescribed for alcohol as known to science and to the trade. Such conflict as there may have been in the testimony was for the jury to resolve. Upon the whole record however, we are of the opinion that the jury were justified in finding that the liquid sold was alcohol within the prohibition statute and that the defendant was guilty of bootlegging. It is, of course, an elementary rule that the evidence for the prosecution must correspond with the allegations of the information and that a material variance between the matters alleged and those proved, is fatal. 33 C. J. 737. On the other hand, § 11,013, Comp. Laws 1913, requires this court to give judgment on appeal without regard to technical errors which do not affect the substantial rights of the parties. In the case at bar, the state charged the defendant with selling alcohol; it was therefore, incumbent upon the State to prove a sale of the commodity described in the information. While the evidence of the state is far from satisfactory, in view of the testimony of the chemist, who was called for the purpose of proving the character of the liquid, we are of the opinion that there is sufficient evidence in the record to support a finding by

the jury that the liquid sold was alcohol, as charged in the information, and we think that the defendant has had a fair trial.

Counsel for the defendant moves for a dismissal of the petition for a rehearing, filed by the state, on the ground that this court has no jurisdiction to entertain it or to grant a rehearing in a criminal case, in view of § 11,019, Comp. Laws 1913, which provides:

"When the judgment of the supreme court is given, it must be entered in the minutes, and a certified copy of the entry forthwith remitted to the clerk of the district court from which the appeal was taken." The contention is that when a decision in a criminal case has been signed by a majority, filed with the clerk of this court, and the customary order for the remittitur made, the remittitur must, under the statute, supra, *forthwith* go forward to the district court and this court is without further jurisdiction in the cause. The fallacy in the argument lies in the failure to appreciate "When the judgment of the supreme court is given" within the meaning of the statute. The court, ever since its organization, has provided by rule, in effect, that the "judgment of the . . . court" is not "given" until after the lapse of a certain number of days from the date of the signing of the decision and of the order, and during such period counsel may call attention to errors in the opinion, or this court, on its own motion, may withdraw the opinion for correction or change. Counsel for parties are, in effect, notified that fifteen days from a given date the decision of the court will be given, an order accordingly entered in the minutes of the clerk, and a certified copy thereof remitted to the clerk of the district court, unless, in the meantime, counsel point to errors in the opinion, or the court itself makes changes or corrections therein.

In Wallace v. Stutsman County, 6 Dak. 1, 50 N. W. 832, the supreme court of Dakota Territory held that it had no jurisdiction to grant a rehearing after the remittitur had been sent down, no fraud, mistake or inadvertence appearing, and in Nystrom v. v. Templeton, 17 N. D. 463, 117 N. W. 743; Hilmen v. Nygaard, 31 N. D. 419, 154 N. W. 529, Ann. Cas. 1917A, 282; Youmans v. Hanna, 35 N. D. 479, 160 N. W. 705, 161 N. W. 797, Ann. Cas. 1917E, 263, the rule was applied as the law in this jurisdiction.

While ordinarily a rehearing is not granted upon questions not presented or discussed in the briefs or in the oral argument, yet, in ex-

ceptional cases, a rehearing may be granted to consider new aspects of material evidence, which may affect the merits of the main controversy, and which, through inadvertence, were not presented by the parties or considered by the court when the original opinion was rendered. It is undoubtedly the duty of this court to grant a rehearing and order a reargument in the interest of justice when it appears that a decision has been based upon a mistaken assumption of fact or a misinterpretation of the evidence. See Security Mut. L. Ins. Co. v. Prewitt, 202 U. S. 246, 50 L. ed. 1013, 26 Sup. Ct. Rep. 619, 6 Ann. Cas. 317. The rule in this respect is not different in criminal cases, where the remittitur has not gone down. See State v. Sund, 25 N. D. 59, 140 N. W. 716, and State v. Council, 129 N. C. 511, 39 S. E. 814. In this state, as generally, a rehearing is not a matter of right, but of privilege; it has been given by this court under rule 15. Unless prohibited by statute, the power to grant a rehearing inheres in appellate courts. 4 C. J. 621, 622. It would be a most anomalous situation if an appellate tribunal, whose decisions are final, did not possess the power to correct errors in its decisions before jurisdiction has been lost through the transmission of the remittitur to the court below.

It has been the uniform practice of this court to entertain petitions for rehearing in criminal cases, whether filed by the state, or by the defendant. As far as we have been able to discover the power to do so has never before been questioned in this State. We are satisfied that this court has the power to grant a rehearing in a criminal case, when the circumstances warrant, as well on the petition of the state as on that of the defendant, and that the granting of the rehearing in the case at bar was justified and proper in the interest of justice.

The judgment is affirmed.

NUESSLE and BURKE, JJ., concur.

CHRISTIANSON, Ch. J. (concurring specially). The only serious question in this case is whether there is a fatal variance between the information and the evidence as regards the kind of intoxicating liquor which the defendant is charged with having sold. The information charged the defendant with the crime of bootlegging, committed by the sale of "one pint of alcohol." The evidence adduced was to the effect

that the bottle sold by the defendant contained a liquid consisting of 94 per cent alcohol, 3 per cent water and 3 per cent acetone. And the appellant contends that this proof is fatally variant from the information. In my opinion no fatal variance existed and the proof adduced justified the jury in returning a verdict finding the defendant guilty of the crime charged.

The information charged "that, heretofore, to wit, on the 12th day of June, in the year of our Lord one thousand nine hundred and twenty-three at the county of Cass in the state of North Dakota, one Anna Cook late of the county of Cass and state aforesaid did commit the crime of bootlegging committed in the manner following, to wit:

"That at said time and place the said defendant did wilfully, unlawfully and feloniously sell and deliver to one Harrison M. Carter one pint of alcohol, the said sale and delivery taking place in room 200 of the Annex Hotel in the city of Fargo, Cass county, North Dakota, and the said room 200 and the Annex Hotel at said time not being owned, kept, maintained or controlled by the said defendant, Anna Cook."

This information was filed under chapter 194, Laws 1915, which provides:

"Sec. 1. Any person who shall sell or barter any intoxicating liquor upon any premises or place, public or private, within the State of North Dakota, not owned, kept, maintained or controlled by him; or, who shall act, directly or indirectly, with or without compensation, as the agent of another in connection with the purchase, or sale of intoxicating liquors; or, who shall solicit, procure or receive from any person, any order, providing for the purchase, sale or furnishing of intoxicating liquors, either for delivery from within or from without this state, except from those authorized by law to sell or barter the same within this state; or, who shall aid, assist or abet in the commission of such crime, shall be guilty of the crime of bootlegging."

The evidence on the part of the state consisted of the testimony of two prohibition agents, Carter and Wright, and a druggist, Hallenberg. Carter and Wright both testified that about 7:45 P. M., on Monday, June 12th, 1923, the defendant Anna Cook came to room 200 in the Annex Hotel in the city of Fargo. As to what occurred at that time and place Carter testified as follows:

A. She came in and had a package under her arm and unwrapped it. She had two pints of alcohol, and she gave us one and I paid her $5 for it. She said she could not give us any more that day because she was going to a show and she would not answer any calls after twelve o'clock.

Q. Did you or Mr. Wright, in your presence, have much conversation with her at that time and place?

A. Mr. Wright asked her if that was good alcohol.

Q. And what, if anything, did she say?

A. She said it was, that she had sold the doctors.

Q. Had sold to the doctors?

A. Yes, and to the Agricultural College and to the best trade in town.

Wright testified:

A. She had a package when she came in and she laid it on the bed and unwrapped it, and there were two pint bottles in it, and she said "I brought up two because I thought maybe you might want more than one. I am going to a show, and I will not answer any calls after twelve o'clock." And we told her one would be enough, and Mr. Carter paid her $5 for one bottle, and she wrapped the other up again.

Q. I will ask you, Mr. Wright, if you had any conversation yourself with the defendant at that time?

A. I did.

Q. Give us that conversation?

A. I asked her if it was good stuff. I told her we didn't want anything but good stuff. She said "This is good stuff." She said they supplied the doctors, and had the best trade, the Agricultural College and she said they guaranteed it that it was good stuff.

The witness, Hallenberg, testified that he lived in Moorhead, and was one of the proprietors of the Central Drug Store in that city. At this point in his direct examination, defendant's counsel said: "Qualifications of the witness is admitted as a chemist, and his qualifications to testify concerning liquids." The witness thereupon testified that the bottle marked state's exhibit "A," had been delivered to him on December 14, 1923, and that he analyzed the contents thereof.

Q. Did you make an analysis to determine the alcoholic content of the bottle?

A. I did.

Q. With what result?

A. I found it to contain 94 per cent alcohol.

Q. That is by volume?

A. By volume.

On cross-examination Hallenberg testified that the liquid in addition to alcohol contained about 3 per cent acetone, and 3 per cent water, so that the analysis showed 94 per cent alcohol, 3 per cent acetone and 3 per cent water.

Q. And that (acetone) is an acid?

A. It is a chemical used in cleaning and in solvents.

Q. Is acetone used in preparation of body rub?

A. It is in some, but not all of them.   .   .   .

Q. Now when alcohol is mixed with 3 per cent of acetone it ceases to be alcohol, does it not?

A. It does not cease to be alcohol, but it is a mixture.   It is a combination of alcohol.

Q. But what is known as alcohol to the chemist is the pure ingredient of alcohol, is it not?

A. Yes, ethyl alcohol.   .   .   .

Q. What effect does acetone in its diluted form have on the membranes of the stomach?

A. It has the property of dissolving all fats, oils and greases.   It takes it out of everything that it comes in contact with.

Q. Even out of the lining of the stomach?

A. Yes.

Q. And you would say, as a chemist, Mr. Hallenberg, that the contents of state's exhibit "A" was equivalent to or similar to "body rub?"

A. Somewhat similar.

Q. And the contents of state's exhibit "A," are the contents fit for beverages?

A. I would not want to drink it myself.

Q. Well, then, it is not fit for beverage purposes, is it?

Mr. Horner: That is calling for a conclusion.

Mr. Wood: Well this witness is an expert.

Mr. Horner: I will withdraw the objection.

A. Well it could hardly be figured fit for body beverages with these ingredients in it. The government has recommended it as being a formula. It can be sold without tax, but is not fit for beverages.

Q. Alcohol mixed with acetone is a mixture that the Government authorizes to be sold for body rub?

A. Yes.

Q. Is the contents of state's exhibit "A" brandy?

A. No.

Q. Is it whiskey?

A. No.

Q. And it is not alcohol?

A. It is a mixture-alcohol.

Q. But it is not alcohol?

A. Not straight alcohol.

Q. It is not a compound fit for beverages?

A. Hardly.

On redirect examination he testified:

Q. You mean when you testified that it was not fit for beverages that you would not want to drink it yourself?

A. Yes.

Q. That is, you would not want, yourself, to drink it?

A. No.

Q. But is it not true that state's exhibit "A" in the form you analyzed, can be used for beverage?

A. Well, it could, but there would be liable to be trouble. That is, if they drank it in any quantity.

Q. I will ask you if drinking this mixture of 3 per cent acetone, would that if taken in major quantity produce serious gastric disturbances?

A. It would be likely to. If a person had an ordinary stomach. It is liable to make disturbance that would not be caused by other liquid.

Q. This is not wood alcohol?

A. No.

On recross examination he testified:

Q. But when there is a mixture of alcohol and water and acetone, the mixture is not alcohol?

A. Not straight alcohol.

On redirect examination, he testified that there are several formulas for rubbing compounds.

On recross examination he testified:

Q. There are a large number of formulas of different ingredients consisting of body rub?

A. Yes.

Q. And this is one of them?

A. Acetone is one of the ingredients used in the preparation of body rubs.

Q. And there are many preparations used in the so-called body rubs?

A. Each larger manufacturer has his own private formula.

During the presentation of defendant's evidence, Hallenberg was called for examination by defendant's counsel. In response to questions then asked by defendant's counsel, he testified:

Q. Mr. Hallenberg, you know as a chemist whether or not alcohol contains any other ingredients other than water and alcohol?

A. If it is pure it should not.

Q. When alcohol contains other ingredients it becomes a compound, does it not?

A. A compound mixture, yes.

Q. And it is not recognized as alcohol, is it?

A. Not as pure alcohol.

By the Court: But it is still alcohol?

A. Its an alcohol mixture. I could hardly describe it any other way.

Q. By the Court: You would not call it anything else, would you?

A. I would call it an alcohol mixture, and depending on the quantity of the other ingredients.

By the Court: Whether you would call it alcohol or something else.

A. I would have to call it an alcohol mixture.

In response to questions asked then by the state's attorney, he testified that he did not know of special formulas for the denaturing of alcohol which contained only water and 3 per cent acetone; but that he did know of formulas that contained acetone.

Q. But all these other formulas contain other elements except water and acetone?

A. Yes. I think there was, but I couldn't find it. I think there was one we had.

Q. During your experience as a chemist you never found any of this specially denatured alcohol that contained just alcohol and acetone?

A. There may be formulas. I haven't a complete list of all of them, and some of them I don't know that they publish books, they have their own private formulas.

Q. You haven't had any come to your attention, any formula containing just alcohol and acetone?

A. Not up to the present time.

It seems to me that under the evidence in this case the trial court was entirely justified in submitting to the jury, as a question of fact, whether the defendant had sold "alcohol" as charged in the information. Intoxicating-Liquor Cases, 25 Kan. 751, 768, 37 Am. Rep. 294.

The opinion expressed by Hallenberg as to the proper name to be applied to the liquid, and as to whether the 3 per cent acetone therein had transformed the liquid into something different than "alcohol" was not conclusive on the jury. Underhill, Crim. Ev. 3d ed. § 185; Horwitz's, 2 Jones, Ev. § 392. See also Axford v. Gaines, 50 N. D. 341, 195 N. W. 555.

The jury had before them not only the testimony of the witnesses, but the bottle containing liquid which the defendant had sold as "alcohol." This liquid, it is true, was not pure alcohol; but 94 per cent thereof was alcohol, and I believe that the jury was entirely justified in finding that the other ingredients did not change the primary and fundamental alcoholic character of the liquid. According to the Century Dictionary, acetone is: "A limpid mobile liquid, $(CH_3)_2CO$, with an agreeable odor and burning taste, produced by the destructive distillation of acetates. It is the destructive distillation of acetates. It is produced on a large scale from the aqueous liquid obtained in the dry distillation of wood." In Autenrieth & Warren on Detection of Poisons, 5th ed. pp. 55, 56 it is said: "Acetone is a clear, colorless liquid, boiling at 56°. It has a peculiar fruity odor and is neutral in reaction. It is miscible in all proportions with water, ethyl and ether. It distills easily with steam. Acetone is not poisonous, nor in the least corrosive. Man and animals can tolerate considerable quantities of acetone taken internally. It seems to produce no effect, though it may possess very feeble narcotic properties."

The fact that the liquid was not pure alcohol and did not conform in all respects to the standards of the Federal Food and Drugs Act, or the United States Pharmacopœia is, in my opinion, not controlling. This so-called "moonshine" whiskey has been held to be whiskey within the meaning of that word as contained in the Prohibitory Acts, though the liquid did not, in fact, conform to the standards of "whiskey" as defined by the United States "Pharmacopœia." United States v. Golden (D. C.) 1 F. (2d) 543; State v. Critzer, 122 Wash. 88, 209 Pac. 1081; State v. Edwards, 106 Or. 58, 210 Pac. 1079. See also State v. Schuck, 51 N. D. 875, 201 N. W. 343.

But even if the term "alcohol" is given the strictest possible interpretation and held to include only alcohol, as defined in the United States Pharmacopœia, it seems to me there would be no material variance between the information and the evidence in this case. For in this state a variance between the averments of the information and the proof is not material unless it misleads the accused in making his defense, or may expose him to the danger of being again put in jeopardy for the same offense. Comp. Laws 1913, § 11,088; State v. Guyer, 47 N. D. 479, 182 N. W. 693; 31 C. J. 840. See also Meyers v.

United States (C. C. A. 2d) 3 F. (2d) 379. This rule is certainly applicable to prosecutions for violation of the prohibitory laws. In the last enactment on that subject, the legislature has said that the same "shall be liberally construed to the end that the use of intoxicating liquor as a beverage may be prevented." Laws 1923, chap. 268, § 2.

It does not seem possible that the alleged difference between the information and the proof in this case could have prejudiced the defendant in maintaining her defense. And there can be no doubt that the conviction in this case can be pleaded as a bar to another prosecution for the sale of the particular liquor in question here to the same persons at the same time and place. Meyers v. United States, supra.

JOHNSON, J. (dissenting). Defendant was convicted of the crime of bootlegging. She was charged with selling "one pint of alcohol." She made a motion in arrest of judgment or, in the alternative, for a new trial. The motion was denied and defendant appeals from the order denying the motion and from the judgment.

The testimony of the state's witnesses tends to show that on June 12, 1923, two prohibition agents met the defendant in a room in a hotel in the city of Fargo, and purchased from her a pint bottle containing a liquid described as "alcohol mixture." The bottle was delivered by the agents to one Cruden, a prohibition official, who kept it until the preliminary hearing before the magistrate. The bottle was alleged to have been sold to one Carter in the presence of Wright, another prohibition agent. Both officials testify, in substance, that the defendant came to their room in the hotel about 7 : 30 in the evening, delivered the bottle to Carter, and received $5 in payment. The state called one Hallenberg, a druggist, as an expert witness. His qualifications are admitted. He testified that he had analyzed the contents of the bottle and found 94 per cent alcohol, 3 per cent water and 3 per cent acetone. One of the state's witnesses says he tested the substance, to determine whether it was water. Casually and incidentally he refers to the contents of the bottle as alcohol. There is no specific or direct testimony in the record either that the contents of the bottle were intoxicating or that the liquid therein was fit for beverage purposes, as delivered or in diluted form. The expert, called

53 N. Dak.—49.

for the sole purpose of proving the nature of the liquid, testified, in general, that it was unfit for beverage purposes because of the presence of acetone. He says that the liquid is "not alcohol," or "not straight alcohol," but "is a mixture-alcohol," or a "compound mixture." He further testifies that alcohol mixed with acetone may be sold without paying a tax and that the government authorizes a sale of the same to be used "for body rub." Interrogated by the Court, the witness testified "it is an alcohol mixture, I could hardly describe it in any other way."

While the defendant assigns several errors, the principal contention is that the state failed to prove that the compound or mixture was fit for beverage purposes. It is urged by the defendant that the mixture is not "alcohol," within the meaning of that term as used in § 1, chapter 268, Sess. Laws 1923; that it is a compound within the second class enumerated in that section and following the clause "in addition thereto;" that, therefore, it was incumbent upon the state to prove, not only an alcoholic content of $\frac{1}{2}$ of 1 per cent or more, but also that the mixture was fit for beverage purposes, within the rule laid down by this court in State v. Schuck, 51 N. D. 875, 201 N. W. 342. The contention of the state, on the other hand, is, and the holding of the trial court was, that the liquid is alcohol, within the statute, and that the presence of 3 per cent of acetone does not take it out of the first part of the act and bring it within the classification of a compound; and, being alcohol, that its fitness as a beverage and its intoxicating quality are presumed. The court did not instruct the jury upon this precise question, merely saying, in substance, that if they found, beyond a reasonable doubt, that the defendant sold alcohol to the officers, as alleged in the information, she was guilty of bootlegging.

The only question is whether there is evidence sufficient to support the verdict in view of the offense charged and the testimony of the state's expert, the only witness testifying on the subject, that the liquid in the bottle is an alcohol mixture, or compound, which, if consumed in any substantial quantity, would produce serious physical disturbances because of the presence of an ingredient foreign to the substance, known to science and to the trade as alcohol.

The defendant is charged with selling "alcohol." The burden is on the state to prove beyond a reasonable doubt, that the contents of the

bottle sold was alcohol within the meaning of that term as used in § 1, chapter 268, Sess. Laws 1923. Notwithstanding the liquid is ordinarily wholly unfit for beverage purposes, the state dispenses with other proof than that it is alcohol, because that substance may be diluted and rendered both potable and, of course, intoxicating. The sole question is whether the mixture described by the state's expert witness is alcohol.

Section 1, chapter 268, Sess. Laws 1923, is set forth in full in the majority opinion and need not be repeated here.

The term "alcohol" has never been defined, judicially or by the legislature, in this state. By § 104, Regulations of the Treasury Department, effective May 1, 1924, alcohol is defined as "that substance known as ethyl alcohol, ·hydrated oxide of ethyl, or spirit of wine, from whatever source or process produced, having a proof of 160 degrees, or more, and does not include the substance commonly known as whisky, brandy, rum or gin."

In Eureka Vinegar Co. v. Gazette Printing Co. (C. C.) 35 Fed. 570, it is said:

"Courts are bound to take notice of the meaning of words in the English language, and of such matters of science as are well known to all men of common understanding and intelligence."

In State v. Giersch, 98 N. C. 720, 4 S. E. 193, the court says:

"Alcohol, this essential element in all spirituous liquors, is a limpid, colorless liquid. To the taste, it is hot and pungent, and it has a slight and not disagreeable scent. It has but one source, the fermentation of sugar and saccharine matter. It comes through fermentation of substances that contain sugar proper, or that contain starch, which may be turned into sugar. All substances that contain either sugar or starch, or both, will produce it by fermentation. It is a mistake to suppose, as many persons do, that it is really produced by distillation. It is produced only by fermentation, and the process of distillation simply serves to separate the spirit—the alcohol—from the mixture, whatever it may be, in which it exists."

In the Encyclopedia Americana, edition of 1918, vol. 1, page 346, the text writer says:

"Unless otherwise qualified, 'alcohol' is understood to mean the liquid known to the chemist as 'ethyl alcohol' and to the trade as

'grain alcohol,' or 'spirits of wine.' It is colorless and inflammable, burning with a flame that is intensely hot but almost non-luminous. Most of the alcohol used in the arts is produced by the fermentation of sugars or starches."

In Webster's New International Dictionary, 1923 ed., alcohol is thus defined:

"A colorless, volatile inflammable liquid, $C_2H_5OH$, one of the products of vinous fermentation and contained in wine (hence called *spirit of wine*), beer, whisky, and the other fermented and distilled liquors, of which it is the intoxicating principle; also, loosely, any liquor containing it. Alcohol is obtained chiefly from potatoes, and various grains, esp. maize, by a process of ·brewing followed by fractional distillation. Even when repeatedly · rectified it still contains water, which can be removed only by continued treatment with some dehydrating agent, such as quicklime. The *absolute alcohol* so obtained boils at 78.3 degrees C., and it has a specific gravity of 0.763. Its odor is very penetrating. Commercial absolute alcohol contains about one per cent of water. It is used only for special purposes. As used in the U. S. 'Pharmacopœia,' *alcohol* means a solution of 91 per cent by weight of ethyl alcohol and 9 per cent of water; and *diluted alcohol* (proof spirit), 45.5 per cent by weight of alcohol and 54.5 per cent of water."

Reference to the statute, § 1, chapter 268, Sess. Laws 1923, supra, shows that the legislature had in mind the well-known fact that alcohol is the intoxicating principle of certain beverages; that these were deemed not to be embraced within the term "alcohol" as used in the law. In other words, alcohol in certain combinations ceases to be such and becomes brandy, whisky, rum, gin, beer, etc. Again, in other combinations it may become "a spirituous, vinous, malt or fermented liquor . . . and compounds," that may not be sold if containing one half of one per cent, or more, of alcohol and if they be "fit for use for beverage purposes." If a liquid be a medicated or proprietary compound, within the statute, it is not alcohol notwithstanding that substance may be its principal ingredient. Neither is beer, brandy, rum, gin, etc., enumerated in the class of liquors presumed to be intoxicating, alcohol, within the contemplation of the statute. The sale of "alcoholic compounds" is expressly prohibited. Section 2, chapter

268, supra. We may not presume that the legislature committed tautology. Having declared alcohol presumptively intoxicating, the statute specifies certain combinations containing alcohol and puts them also under the ban. The lawmaking body essayed no definitions of alcohol, but by necessary implication set it apart as a substance separate and distinct from enumerated combinations in which it is the intoxicat-- ing principle. That the term was used in the only conceivable definite sense, that of science and the trade, cannot be doubted.

After careful consideration I have come to the conclusion that by the word "alcohol," the legislature meant a liquid which the chemist knows as "ethyl alcohol," and the public or the trade as "grain alcohol" or "spirit of wine." Such is the only testimony on the subject in the case at bar. According to the testimony of the chemist, the liquid known as alcohol contains alcohol and water with no other ingredients. He testified, that, according to the "official Pharmacopœia issued by the United States government" there are three kinds of alcohol, viz., commercial alcohol, containing 94 per cent alcohol and 6 per cent water; absolute alcohol, containing 99 per cent alcohol and 1 per cent water; and diluted alcohol, containing 50 per cent water. It would seem clear that the legislature, in using the term, intended a sub-stance susceptible of reasonably precise definition, and therefore, meant to use it either in the scientific or the trade sense, i. e., "ethyl alcohol" or "grain alcohol." When alcohol is mixed with other ingredients it may cease to be "alcohol" and become something else. Alcohol in certain combinations—wine, beer, etc., and mixtures and compounds —is expressly dealt with in the statute; the statute is penal and should be definite in so far as it defines what shall constitute a crime. Should we hold that the legislature did not intend to use the term in the scientific or trade sense, the uncertainty and confusion that would result cannot be foreseen. If ethyl or grain alcohol—the "alcohol" of science and of the trade—may contain a substantial admixture of ingredients which are wholly foreign without losing its character as grain alcohol, the result would be confusion worse confounded in the law of intoxicating liquor. Science has drawn the line that divides alcohol from other liquids; and the trade has accepted the conclusion of science in this respect. I am unwilling to attribute to the legislature an intention to use this term otherwise than in the accepted scientific

sense when all must confess inability to define it without introducing uncertainty and chaos. If 3 per cent of acetone may be introduced without destroying the character of the liquid as alcohol, why may not other distinctive ingredients be added? Then, if the liquid contained 20 per cent instead of 3 per cent acetone, it will still be alcohol. And if others might be added, we should have compounds or mixtures which no informed person, using the language with accuracy, would recognize or speak of as alcohol. What percentage of and what foreign substances may be introduced before the mixture ceases to be alcohol? The question suggests the sea of trouble and confusion that lies ahead should we hold that the legislature meant any other substance than alcohol in the trade or scientific sense.

What is acetone? In vol. 1, Encyclopedia Americana, p. 84, acetone is thus described:

"A limpid, mobile liquid with a taste suggestive of peppermint, Formula, $CH_3COCH_3$. It occurs in crude wood-alcohol, from which it can be separated by distilling over calcium chloride. It is also obtained by the destructive distillation of acetates, notably those of barium and lead. It occurs in the urine, blood and brain of calcium diabetic patients. Lieven's test for acetone in the urine is as follows: Distilled urine is made alkaline by caustic potash and a few drops of a solution of iodine and iodide of potassium are added. If acetone is present a yellow precipitate of iodoform is formed at once; if alcohol be present in the distillate, the same reaction takes place, but more slowly; but with acetone the reaction is immediate. Acetone is very inflammable and burns with a white smokeless flame. It boils at 133°F. at ordinary atmospheric pressure; its specific gravity at ordinary temperature is about 0.800. Acetone is a valuable solvent for scientific and technical purposes."

The state's expert says that it "has the property of dissolving all fats, oils and greases. It takes it out of everything that it comes in contact with. Even out of the lining of the stomach." Again he says that the mixture is "somewhat similar to a 'body rub.'" Acetone is one of the ingredients of wood or methyl alcohol. Crude wood spirit contains it in substantial quantities. The witness says that "it would hardly be fit for body beverages with these ingredients in it. The government has recommended it as being a formula. It can be sold

without a tax, but is not fit for beverages." In one of the formulae of the United States government acetone is given as one of the ingredients of completely denatured alcohol. McFadden, Prohibition, pp. 1033, 1034. It is impossible, I think, to escape the conclusion that acetone is a distinct chemical, and, in the quantity present in the liquid in question, is wholly foreign to the substance known in chemical science or to the trade as alcohol. It may be true that microscopic traces of acetone are occasionally found in alcohol, but that is not the situation here.

It does not follow that the presence of any foreign substance or ingredient, no matter how trifling, or what its nature, necessarily destroys the character of alcohol as such. All the expert evidence here shows that acetone in any substantial quantity is not only foreign to "alcohol," but that it is a solvent which renders the compound unfit for use as a beverage. The fact that men may drink the mixture in ignorance of its true character, and take a chance that premature death may result as a logical probability, does not make the liquid alcohol within the meaning of a statute that does not declare it a violation of the prohibition law to sell knowingly a compound that may in fact be wholly unfit as a beverage, e. g., wood alcohol, when the seller knows that the purchaser thinks it is potable and intends to drink it. Other penal statutes may be violated, but not the statutes under consideration in this case.

It must also be noticed that the defendant is here charged with the specific offense of selling *alcohol;* she is not charged generally with selling *intoxicating liquor* for beverage purposes. Had the information against her, alleging the offense of bootlegging, as defined in chapter 194, Sess. Laws 1915, averred that she sold intoxicating liquor for beverage purposes, in violation of chapter 268, Sess. Laws, 1923, an entirely different question would have been presented. Section 2 of chapter 268, supra, expressly recognizes *"alcoholic compounds"* and prohibits their sale "for beverage purposes . . . or under circumstances from which the seller may reasonably deduce an intention on the part of the purchaser to use the same for beverage purposes." No such charge is made against the defendant.

The testimony which the majority opinion finds sufficient to support the verdict, appears to me to be wholly shadowy and indefinite. It

was not responsive to the question asked; it was incidental and volunteered. It was not regarded by the state or the defense as worthy of any weight or consideration. In due time and at the proper stage in the proceedings the state proved by an expert chemist who had made an analysis of the liquid that the contents of the bottle was not alcohol. On this testimony the state rests its case. In my opinion there was a total variance between the crime charged and the one proved. She was informed against for selling alcohol; under this information proof of the sale of alcohol would be sufficient to convict. The law declares it presumptively intoxicating and fit for beverage purposes. The State proved that an alcoholic mixture or compound was sold; under the statute, in such a case the evidence must also show that the compound is fit for beverage purposes. The expert said the compound here involved was not fit for beverage purposes. I cannot conceive of a clearer case of legal variance.

It seems to me that the state failed to prove the crime charged, and that the judgment appealed should be reversed. Under the Constitution and the laws of this State a defendant is entitled to be informed of the charge against him. This is a right which it is the duty of this court to maintain inviolate. In the case at bar, we may all be convinced that the defendant is guilty of an offense against the prohibition law; it is none the less our duty under the law when *the* offense charged has not been proved by the state, to say so. No other rule, on the one hand, safeguards the constitutional rights of persons accused of crime, or, on the other, fully confines the courts within their proper sphere.

BIRDZELL, J., concurs in dissenting opinion.